UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE # <u>0:13-cv-62783-XXXX</u>

KIMBERLY SHAGENA, MICHELLE ESPIDO,
DOMINIQUE TAVAREZ, and DIANA ALLEN
      Plaintiffs

vs.

FLANIGAN'S ENTERPRISES, INC.,
A Florida corporation
      Defendant
_____/

## <u>COMPLAINT</u>

### <u>PARTIES</u>

1.     Plaintiff Kimberly Shagena is a resident of Palm Beach County, Florida who worked for the Defendant at their Wellington, Florida location.

2.     Plaintiff Michelle Espido is a Broward County, Florida resident worked at the Defendant's Davie, Florida location.

3.     Plaintiff Dominique Tavarez is a Broward County resident who worked at the Defendant's Davie, Florida location.

4.     Plaintiff Diana Allen is a Palm Beach County resident who worked for, and still works for, the Defendant at their Wellington, Kendall and Hialeah locations.

1

5.      Defendant Flanigan's Enterprises, Inc. ("Flanigan's" or the "Defendant"), a Florida corporation listed on the American Stock Exchange (BDL), operates a chain of full-service restaurants and package liquor stores in south Florida, and has nearly 900 fulltime employees.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred by the Civil Rights Act of 1964 pursuant to 42 U.S.C. §2000e et seq. ("Title VII") with supplemental jurisdiction for the Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq. ("Florida Civil Rights Act") conferred for the state claims under 28 U.S.C. §1367.

7.      Venue is appropriate in Broward County, Florida as Flanigan's is headquartered in Fort Lauderdale, several of the Plaintiffs' claims arise out of a restaurant located in Broward County, and the corporate response and personnel acting against the Plaintiffs was directed from that venue.

## FACTUAL BACKGROUND

8.      Several former employees and one current employee of Flanigan's were subjected to sex discrimination and retaliation. Additionally another employee has a claim for battery due to workplace violence she was subjected to and some of the actions, related to her and another employee, are so shocking to society's conscience that a claim for intentional infliction of emotional distress is warranted.

9.      The defendant's actions span several restaurants all actively controlled by their corporate office and representatives.

10.     All the Plaintiffs filed complaints and charges with the EEOC, right to sue letters have been received, and their claims are ripe for adjudication by this Court.


### Flanigan's Wellington

11.     Kimberly Shagena is a 44 year old female who began working for Flanigan's in their Wellington location as a server in 2006. She had always been regarded as one of the best servers in terms of food and liquor sales and won numerous awards throughout her tenure at the restaurant.

12.     In March of 2012, Wellington restaurant manager Mike Nascarella informed Ms. Shagena and other restaurant staff members that a former server named Darlene Hubert was promoted to manager because she allegedly slept with the restaurant's general manager, Tom Sheppard. Ms. Shagena informed Mr. Nascarella to not discuss such things with her as it made her uncomfortable and that she did not want to be involved with rumors and gossip regarding her coworkers.

13.     Two months later in May of 2012, Mr. Nascarella again came to Ms. Shagena to inform her that a bartender at the Wellington location named Tricia allegedly got drunk was caught performing solo sexual acts in the bushes on the side of the restaurant in front of other employees. He also informed her that this bartender was with the general manager Mr.

Sheppard the night he got his 3rd DUI arrest and he told her other sexually disparaging remarks about that bartender. Ms. Shagena again told Mr. Nascarella that such conversation was highly inappropriate and offensive to her.

14.     Then in June of 2012, Ms. Shagena spent $500 on hair extensions and redid her hairstyle. Mr. Nascarella told her she looked ridiculous trying to look younger and that he liked her old hairstyle better. Ms. Shagena felt humiliated and removed her hair extensions the following day.

15.     On Friday, July 6, 2012, Ms. Shagena was called into the office at the Wellington restaurant and confronted by Mr. Nascarella, Mr. Sheppard, Jessica Saville (a Flanigan's staff trainer), and Keith Riolino (another manager) that according to an unnamed Flanigan's employee she was being "negative about Flanigan's and the restaurant." Flanigan's punished her by suspending her for two shifts without giving her a chance to refute the allegations.

16.     Mr. Sheppard informed Ms. Shagena it was none of her business who made the allegation against her. Ms. Shagena had not previously received any warning or negative written evaluation, and she told Mr. Sheppard she believed this suspension was retaliation against her because she refused to support Flanigan's in defending themselves against allegations made against them by Ms. Hubert. Mr. Sheppard informed Ms.

Shagena if she had a problem with her suspension she could call their legal department and lodge a complaint.

17.     Ms. Shagena was placed on the schedule for Sunday, July 8th, 2012, by Mr. Sheppard as punishment because he knew that was generally her day off from work. That day at work, she was informed by two coworkers, Trish and Casey, also on shift that day that Flanigan's had a corporate trip to Peanut Island. They said that, like Ms. Shagena, they were called into work because only the young and pretty servers and bartenders were invited to the Flanigan's trip to Peanut Island. Another employee working that shift, Megan Dorschel, told Ms. Shagena she asked to go to Peanut Island but when Mr. Nascarella informed her she had to wear a bikini she refused and thus was not allowed to attend the trip. The staff working that day were highly upset they were shunned from the Flanigan's corporate trip and further upset that Mr. Nascarella told the younger employees to keep the trip a secret from their "old, fat or ugly" coworkers.

18.     On July 10, 2012, Ms. Shagena emailed Flanigan's corporate office that she felt she was suspended in retaliation for her not lying on behalf of Flanigan's to support their defense against Ms. Hubert. She alleged in that email that she felt the restaurant managers were bullying her to not support Ms. Hubert's allegations against Flanigan's for sexual harassment and that she merely wanted to stay out of the entire situation and that management was improperly forcing her involvement.

19.     Further, in that July 10, 2012 email, Ms. Shagena asked Flanigan's corporate for guidance on how to handle the situation with her managers because the suspension was negatively affecting her financially and psychologically distressing her.

20.     Several days later, Ms. Shagena received a phone call from Chris O'Neal, a Flanigan's supervisor from the corporate office, who told her he understood the anxiety she felt and for her to wait for his solution until the other corporate supervisor, Davene Moretti-Munoz, got back from vacation.

21.     On July 14, 2012, Ms. Shagena was again called into the office at the Wellington restaurant by Sheppard, Nascarella and Riolino. She told them she was not comfortable without a female present but they refused her request and said she would be immediately terminated unless she came in the office with them. The three managers told Ms. Shagena to sign her July 6, 2012, negative evaluation and that if she did not sign it they would also immediately terminate her. Ms. Shagena advised she called corporate and was waiting to hear back from them and that she felt uncomfortable signing that evaluation, but when again told she would be terminated she reluctantly signed the evaluation.

22.     The following week, Ms. Shagena received a phone call from Julian Diaz, Flanigan's corporate restaurant operations supervisor. He told Ms. Shagena that corporate wanted her transferred out of the Wellington location.

23.     She advised him that she had a large clientele base of steady customers who asked for her table and she built up a great reputation amongst her regular customers, including numerous doctors, lawyers, a prosecutor, and even a long-time Palm Beach County Court judge every single Wednesday evening and a Lexus car club of eight to 15 people every Thursday night shift. Mr. Diaz advised he would call Ms. Shagena back though she never heard from him again.

24.     On July 21, 2012, Ms. Shagena was again called into the office and told by Mr. Nascarella and Mr. Riolino that even though she was their most profitable server that corporate wanted her terminated. This was after the fact she signed the negative evaluation suspending her for two days and that she had no other incidents whatsoever between July 6 and July 21, 2012.

25.     They alleged corporate was upset she complained to them of her treatment and that they were also upset she advised a 19 year old server, Paige Manera, to file a complaint with corporate after Ms. Nascarella allegedly told Ms. Manera that he desired to do "inappropriate things to her."

**Flanigan's Davie**

26.         Michelle Espido was a long-time employee and server at the Flanigan's restaurant in Davie, Florida.   She was employed by the Flanigan's since December 2005 and had no history of negative

evaluations or disciplinary actions.  She was well-liked by her fellow staff members and had regular clientele, including local business owners, who witnessed the harassment and subsequent retaliation by Flanigan's coworkers and supervisors against Ms. Espido that ultimately resulted in her termination.

27.      Ms. Espido was repeatedly subjected to aggressive sexual harassment and unwanted advances by a manager and then retaliated against by Flanigan's after she made a formal complaint to both their corporate headquarter and the EEOC. Ms. Espido was fired on March 7, 2012.

28.      The Kitchen Manager, Jose Munoz, had made multiple comments in front of witnesses and gestured directly to Ms. Espido and to other staff members about her that were sexually aggressive and harassing.  Munoz stated he wanted to "smell her [Ms. Espido's] panties" and to "eat her [Ms. Espido's] dirty tampons."  Further, Munoz made comments regarding Ms. Espido's anatomy, specifically her breasts, and stated that she "distracted" his kitchen staff because she "was different" from the other servers physically.  There were multiple witnesses to these occurrences including staff, management, and customers.

29.      Ms. Espido had requested of her manager Rick for her schedule to be altered to assist her in avoiding Munoz, however Munoz continued to visit the store even during his time off to harass, stalk and watch Ms. Espido while she worked, all the while making crude and

degrading comments in front of the staff members and customers.  Though Munoz's behavior was unwelcomed and unwanted, and though Ms. Espido had made multiple requests for his advances to cease directly to Munoz and to both in-store management and Flanigan's corporate office, she was left not only without protection from her employer, but was retaliated against by Flanigan's because she formally complained to the EEOC and they ultimately terminated her.

30.        On October 25, 2011, Ms. Espido sent a written notice of harassment to the Defendant's corporate office at the suggestion of Claire Kaufman, the Human Resources Manager.  This letter was faxed by Ms. Espido upon request by Ms. Kaufman after their multiple telephonic conversations in which Ms. Espido detailed the harassment by Munoz.  The letter was signed and witnessed by other staff members including Dominique Tavarez, Amanda Burrage and Samantha Woods.   Ms. Kauffman assured Ms. Espido that she would not be retaliated against for making a formal complaint as the latter was afraid for her job security after local management was unable to control Munoz's behavior, and his anger and sexual comments were increasing in intensity.

31.        The formal written complaint to Flanigan's corporate office however, went unanswered and unacknowledged for weeks.   The harassment and advances by Munoz continued against Ms. Espido, and the assurance of no retaliation made by Ms. Kaufman was false.  Now, not

only was Ms. Espido openly retaliated against, but so were her colleagues that signed as witnesses.

32.     When Ms. Espido's formal complaint was not addressed by the Defendant within a month's time, she then submitted a complaint through the EEOC.  It was approximately one month after the Ms. Espido made her formal complaint to the corporate office, and upon Flanigan's receipt of the EEOC complaint, that the corporate office finally "investigated" her allegations and her repeated requests for help.

33.     Terri Cecil, Kitchen Operations Supervisor, Flanigan's corporate representative in this matter, arranged a meeting and arrived at the Davie restaurant to interview Ms. Espido in front of the restaurant's general manager Elaina Gomez, and the male assistant general manager.

34.     Ms. Cecil asked Ms. Espido if she wrote the complaint letter, if it was truthful, and if she'd go to court and testify if it was true.  Ms. Espido affirmatively answered each question.  Ms. Cecil then said to her that Flanigan's "would look into it", however the restaurant never contacted Ms. Espido again regarding the matter, and the harassment continued until Flanigan's quietly transferred Munoz one month later to another store location.

35.     This transfer, however, did not prevent management from having Munoz continue working at the Davie location on an as-needed basis, nor did this new arrangement provide protection for Ms. Espido, as

Munoz continued to harass her both on his scheduled work and personal time at the Davie restaurant.

36.        Following the meeting with Ms. Cecil and the general manager and assistant general managers, the retaliation against Ms. Espido began in earnest.  The Davie General Manager Ellaina Gomez stated in a staff meeting in which Ms. Espido was present that "someone was calling corporate and complaining about sexual harassment" and that "someone was just 'trying to get attention' and it wasn't appreciated [by corporate]".

37.        Further, Ms. Gomez told Ms. Espido in front of the other staff members to "keep calling them [the corporate office]. I don't care. You're just putting yourself out there."  Ms. Gomez then continued her efforts to have Ms. Espido terminated.

38.        Ms. Gomez refused to provide the Ms. Espido with necessary uniform items provided to the other staff members by the restaurant on St. Patrick's Day, and had Ms. Espido drive to various stores to "figure it out" and that "it's not my problem" that she was not supplied the same uniform items as the other staff members.

39.        Ms. Gomez told her to "leave me [Ms. Gomez] alone" and to "go to Ross ad buy your own" when Ms. Espido asked for help in obtaining the required uniform that was supplied to every staff member except for her. Ms. Gomez then sent Ms. Espido home early, and then suspended her for two days without pay due to the St. Patrick's Day uniform matter.

40.         Ms. Gomez removed Ms. Espido from the schedule completely, and then scheduled a staff meeting during this time and terminated Ms. Espido for not showing up to the staff meeting when there was no way she should have known a mandatory meeting occurred. Ms. Gomez then withheld Ms. Espido's paycheck, and refused to release her pay, even after the she contacted the Flanigan's human resources manager, Ms. Kaufman.

41.         For next three weeks Ms. Espido attempted to communicate with Davie's general manager and their corporate office to determine if she had been terminated or to obtain her final paycheck.  Ms. Gomez refused Ms. Espido's phone calls and attempts to meet, withheld her paycheck, and also refused to allow the assistant general manager, Scott, to have contact with Ms. Espido or release her paycheck.  Scott also was advised to let the customers and staff know that Ms. Espido was considered a "no re-hire".

42.         After those three weeks passed, she again contacted Ms. Kaufman and Ms. Kaufman assured the Ms. Espido that they would have Ms. Gomez contact her, however that never happened and Ms. Espido was still unpaid and unclear for the reason for her sudden inexplicable termination.

43.         After Flanigan's corporate or Davie's managers failed to respond, Ms. Espido finally made an unannounced appearance at the Davie restaurant, where Ms. Gomez forced her to sign three written

disciplinary actions in order for her to obtain her paycheck.  Ms. Gomez would not release Ms. Espido's paycheck without a signature on the factually false and previously unseen disciplinary statements.

44.        Ms. Gomez would not provide Ms. Espido with copies of the disciplinary actions citing that the copies were "legally Flanigan's property."   Ms. Gomez further demanded that the Ms. Espido give Flanigan's her personal apron and nametags, though they were Ms. Espido's personal property. Ms. Gomez then told her that she was no longer permitted on Flanigan's property and to stay away from the restaurant.

45.        Staff witnesses to these events and to Ms. Espido's allegations were pressured to withdraw their statements as Flanigan's suggested that they too would be either terminated or their chances of advancement would be severely hindered.

46.        This action by Flanigan's resulted in witness Amanda Burrage retracting her statement.   She was then temporarily promoted after changing her story.

47.         Another person who witnessed and signed a witness statement on behalf of Ms. Espido, Dominque Tavarez, was also harassed, retaliated against and subsequently terminated as well.

48.        Dominique Tavarez was, like Ms. Espido, a server at Flanigan's Davie location. She was hired by Flanigan's on March 1, 2011,

and was terminated during her pregnancy by general manager Elaina Gomez.

49.　　　　On or about October 11, 2011, Ms. Tavarez's coworker Ms. Espido complained to corporate that she was being sexually harassed by the kitchen manager, Jose Munoz. Management asked Ms. Espido to find witnesses to her harassment and have those witnesses sign her letter describing her sexual harassment based upon Mr. Munoz's conduct.

50.　　　　Ms. Tavarez witnessed the harassment against Ms. Espido by Mr. Munoz and accordingly she signed Ms. Espido's letter detailing said harassment. Almost immediately thereafter, Flanigan's corporate sent a representative to the Davie location to speak with Ms. Gomez and find out who the witnesses were. Corporate let the kitchen staff know who signed the letter and allowed Mr. Munoz to harass and retaliate against Ms. Tavarez in response to her being a witness to Ms. Espido's harm at the hands of Mr. Munoz.

51.　　　　The harassment and retaliation against Ms. Tavarez included Mr. Munoz belittling and yelling at Ms. Tavarez in front of her coworkers and customers. Mr. Munoz also sent Ms. Tavarez home from work one day for no reason other than to retaliate against her for being a witness which financially harmed her.

52.　　　　Then the harassment escalated as Flanigan's reduced Ms. Tavarez's schedule from five days a week to two or three days a week, further financially harming her for the sole reason that she acted as a

witness to another person's sexual harassment at the behest of management.   Furthermore, Ms. Gomez intimidated Ms. Tavarez by stating that "Jose was not going anywhere; if anyone had to leave, it would be me or the coworker who filed the sexual harassment claim."

53.        On February 12, 2012, Ms. Tavarez went on maternity leave and returned to work in April of 2012. Upon her return, Ms. Tavarez found the schedule had her merely listed as in "training." However, another similarly situated server who went on maternity came back to work after maternity leave and was scheduled as a full-time employee and not merely on a "training" schedule. The only difference is that server was not a signed witness to the sexual harassment endured by Ms. Espido.

54.        On April 21, 2012, three hours prior to her scheduled shift, Ms. Tavarez informed her shift manager, Anne, that she had some difficulties with her children that day and Anne asked her to instead come into work the following Sunday at noon. Ms. Tavarez arrived as directed and Ms. Gomez immediately terminated Ms. Tavarez for "no call/no show." Thus, Anne and Ms. Gomez purposely retaliated against Ms. Tavarez because she signed a witness statement against a coworker being sexually harassed by a kitchen manager.

55.        That Sunday, Ms. Gomez grabbed brooms in each hand and chased Ms. Tavarez around the restaurant screaming at her to leave the restaurant immediately. Such violence of action physically scared Ms.

Tavarez who just gave birth and was being threatened with no intervention from coworkers who were scared to get involved.

56.        Because this retaliation occurred simultaneous with her complaining about illegal activity in conjunction with her recent maternity leave, Ms. Tavarez was doubly discriminated against.


## Flanigan's Kendall

57.        Diana Allen is a long-time bartender at Flanigan's who has worked at their Kendall, Wellington, and currently, Hialeah locations. She has worked for Flanigan's over 25 years and is one of the most tenured employees in the entire history of the restaurant chain.

58.        On June 7, 2013, Mrs. Allen was sexually harassed by a coworker. She immediately reported the incident to the Kendall location manager, to August Bucci, a Flanigan's Chief Operating Officer, and to Julian Diaz, Flanigan's corporate supervisor of all south Florida bars.

59.        The next day, Mrs. Allen filed a police report for battery and the Kendall police department came to the Kendall Flanigan's location and procured videotape from the previous night. The video clearly showed a coworker, Magno Quiroz, laughingly sneak up on her, grab her breasts and then walk away from her.

60.        In retaliation for calling the police and allowing them to come to the Kendall restaurant, Flanigan's restaurant operations supervisor, Carla Stahl, told Mrs. Allen she could no longer work at the Kendall

location and was being transferred to the Hialeah restaurant. Mrs. Allen protested it was unfair the person who grabbed her breasts got to stay and work in Kendall while they punished her by removing her to a location in Miami where the majority of the staff and customers speak Spanish to one another. In response, she was told that she had no business calling the police.

61.        The criminal defendant in Mrs. Allen's case, Magno Quiroz was charged by the Miami State Attorney's Office on September 10, 2013, and he pled guilty to one count of battery against Mrs. Allen during the first week of December, 2013. Notwithstanding the above facts, Mr. Quiroz was never punished by Flanigan's. Rather, corporate was upset at Mrs. Allen for complaining about the sexual harassment and they moved her to a location where she now severely struggles as she only speaks English and she has lost the customer base she spent 25 years establishing at Flanigan's.

**COUNT I (PLAINTIFF SHAGENA'S TITLE VII SEX DISCRIMINATION)**

62.        At all times relevant, Plaintiff Shagena and the Defendant were covered by the requirements are prohibitions of Title VII, specifically 42 U.S.C. §2000e-2(a)(1).

63.        Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

64.     The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to Title VII.

65.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

66.     Plaintiff additionally seeks attorney fees and costs as provided for under Title VII.

67.     The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.

### COUNT II (PLAINTIFF SHAGENA'S FCRA SEX DISCRMINATION)

68.     At all times relevant, Plaintiff Shagena and the Defendant were covered by the requirements are prohibitions of the FCRA, specifically Fla. Stat. §760.01 et seq.

69.     Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

70.     The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to the FCRA.

71.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

72.     Plaintiff additionally seeks attorney fees and costs as provided for under the FCRA.

73.     The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

**COUNT III (PLAINTIFF SHAGENA'S TITLE VII RETALIATION)**

74.     At all times relevant, Plaintiff Shagena and the Defendant were covered by the requirements and prohibitions of Title VII, specifically 42 U.S.C. §2000e-3(a).

75.        Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

76.        The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to Title VII.

77.        As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

78.        Plaintiff additionally seeks attorney fees and costs as provided for in Title VII.

79.        The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.

**COUNT IV (PLAINTIFF SHAGENA'S FCRA RETALIATION)**

80.        At all times relevant, Plaintiff Shagena and the Defendant were covered by the requirements and prohibitions of the Florida Civil Rights Act, Fla. Stat. §760.01 et seq.

81.     Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

82.     The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to the FCRA.

83.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

84.     Plaintiff additionally seeks attorney fees and costs as provided for in the FCRA.

85.     The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.


**COUNT V (PLAINTIFF ESPIDO'S TITLE VII SEX DISCRMINATION)**

86.     At all times relevant, Plaintiff Espido and the Defendant were covered by the requirements are prohibitions of Title VII, specifically 42 U.S.C. §2000e-2(a)(1).

87.        Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

88.        The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to Title VII.

89.        As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

90.        Plaintiff additionally seeks attorney fees and costs as provided for under Title VII.

91.        The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.


**COUNT VI (PLAINTIFF ESPIDO'S FCRA SEX DISCRIMINATION)**

92.        At all times relevant, Plaintiff Espido and the Defendant were covered by the requirements are prohibitions of the FCRA, specifically Fla. Stat. §760.01 et seq.

93.      Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

94.      The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to the FCRA.

95.      As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

96.      Plaintiff additionally seeks attorney fees and costs as provided for under the FCRA.

97.      The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

## COUNT VII (PLAINTIFF ESPIDO'S TITLE VII RETALIATION)

98.      At all times relevant, Plaintiff Espido and the Defendant were covered by the requirements and prohibitions of Title VII, specifically 42 U.S.C. §2000e-3(a).

99.        Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

100.    The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to Title VII.

101.    As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

102.    Plaintiff additionally seeks attorney fees and costs as provided for in Title VII.

103.    The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.

**COUNT VIII (PLAINTIFF ESPIDO'S FCRA RETALIATION)**

104.     At all times relevant, Plaintiff Espido and the Defendant were covered by the requirements and prohibitions of the Florida Civil Rights Act, Fla. Stat. §760.01 et seq.

105.     Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

106.     The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to the FCRA.

107.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

108.     Plaintiff additionally seeks attorney fees and costs as provided for in the FCRA.

109.     The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

**COUNT IX (PLAINTIFF TAVAREZ'S TITLE VII SEX DISCRMINATION)**

110.     At all times relevant, Plaintiff Tavarez and the Defendant were covered by the requirements are prohibitions of Title VII, specifically 42 U.S.C. §2000e-2(a)(1).

111.    Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

112.    The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to Title VII.

113.    As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

114.    Plaintiff additionally seeks attorney fees and costs as provided for under Title VII.

115.    The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.

**COUNT X (PLAINTIFF TAVAREZ'S FCRA SEX DISCRIMINATION)**

116.    At all times relevant, Plaintiff Tavarez and the Defendant were covered by the requirements are prohibitions of the FCRA, specifically Fla. Stat. §760.01 et seq.

117.     Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

118.     The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to the FCRA.

119.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

120.     Plaintiff additionally seeks attorney fees and costs as provided for under the FCRA.

121.     The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

**COUNT XI (PLAINTIFF TAVAREZ'S TITLE VII RETALIATION)**

122.     At all times relevant, Plaintiff Tavarez and the Defendant were covered by the requirements and prohibitions of Title VII, specifically 42 U.S.C. §2000e-3(a).

123.    Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

124.    The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to Title VII.

125.    As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

126.    Plaintiff additionally seeks attorney fees and costs as provided for in Title VII.

127.    The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.

**COUNT XII (PLAINTIFF TAVAREZ'S FCRA RETALIATION)**

128.    At all times relevant, Plaintiff Tavarez and the Defendant were covered by the requirements and prohibitions of the Florida Civil Rights Act, Fla. Stat. §760.01 et seq.

129.    Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

130.    The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to the FCRA.

131.    As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

132.    Plaintiff additionally seeks attorney fees and costs as provided for in the FCRA.

133.    The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

**COUNT XIII (PLAINTIFF ALLEN'S TITLE VII SEX DISCRMINATION)**

134.    At all times relevant, Plaintiff Allen and the Defendant were covered by the requirements are prohibitions of Title VII, specifically 42 U.S.C. §2000e-2(a)(1).

135.    Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

136.    The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to Title VII.

137.    As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

138.    Plaintiff additionally seeks attorney fees and costs as provided for under Title VII.

139.    The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.


**COUNT XIV (PLAINTIFF ALLEN'S FCRA SEX DISCRIMINATION)**

140.    At all times relevant, Plaintiff Allen and the Defendant were covered by the requirements are prohibitions of the FCRA, specifically Fla. Stat. §760.01 et seq.

141.     Plaintiff was discriminated against in the course of her employment as described above in the factual allegations.

142.     The wrongful conduct of the Defendant, as described herein, constituted gender discrimination and resulted in disparate treatment contrary to the FCRA.

143.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

144.     Plaintiff additionally seeks attorney fees and costs as provided for under the FCRA.

145.     The Defendant's discriminatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

## COUNT XV (PLAINTIFF ALLEN'S TITLE VII RETALIATION)

146.     At all times relevant, Plaintiff Allen and the Defendant were covered by the requirements and prohibitions of Title VII, specifically 42 U.S.C. §2000e-3(a).

31

147.     Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

148.     The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to Title VII.

149.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

150.     Plaintiff additionally seeks attorney fees and costs as provided for in Title VII.

151.     The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under Title VII.


### COUNT XVI (PLAINTIFF ALLEN'S FCRA RETALIATION)

152.     At all times relevant, Plaintiff Allen and the Defendant were covered by the requirements and prohibitions of the Florida Civil Rights Act, Fla. Stat. §760.01 et seq.

153.     Plaintiff was retaliated against in the course of her employment for protesting discriminatory activities that warrant protection as described above in the factual allegations.

154.     The wrongful conduct of the Defendant, as described herein, constituted retaliation and resulted in her unlawful termination contrary to the FCRA.

155.     As a direct and proximate result of the Defendant's unlawful actions, as described above, the Plaintiff has suffered the following injuries and damages: (a) Lost compensation, including wages and benefits; (b) Severe emotional distress, including fear, anxiety and depression; (c) Loss of reputation; (d) Loss of dignity and self-esteem; (e) Loss of earning capacity; and (f) Other damages to be determined.

156.     Plaintiff additionally seeks attorney fees and costs as provided for in the FCRA.

157.     The Defendant's retaliatory practices were done with malice or reckless indifference to the federal and state rights afforded to aggrieved individuals, and accordingly the Plaintiff seeks leave to request punitive damages under the FCRA.

### COUNT XVII (PLAINTIFF ALLEN'S CLAIM FOR UNLAWFUL ACTION AGAINST EMPLOYEE SEEKING PROTECTION)

158.     At all times relevant, Fla. Stat. §741.313 applies to Plaintiff Allen and the Defendant where the Defendant has over 50 employees.

159.    Plaintiff Allen was subject to a battery that occurred at her place of work where the assailant was a coworker. The unlawful act is applicable under this statute as battery is one of the requisite elements according to Fla. Stat. §741.28.

160.    The Defendant was supposed to assist law enforcement, to keep the battery private and not spread it throughout the corporation and her coworkers, especially since the battery was of a sexual nature.

161.    An employer may not discharge, demote, suspend, retaliate, or in any other manner discriminate against an employee for exercising his or her rights under this section.

162.    Plaintiff Allen was retaliated against as her situation was publicized by corporate to management and to other coworkers.

163.    Moreover, Plaintiff Allen was retaliated against under this section because she was punished by being transferred to another location causing her financial and psychological hardship; whereas the batterer suffered no repercussions and not only kept his job, but was allowed to stay in the same store while the Defendant transferred out the victim.

164.    The Plaintiff is entitled to legal and equitable damages, including compensatory damages for the lost wages suffered by this retaliatory action by the Defendant in contradiction of this statute.

## COUNT XVIII (PLAINTIFF ALLEN'S BATTERY)

165.     Plaintiff Allen was physically battered by a coworker in June of 2013 in a sexual manner.

166.     Coworker Magno Quiroz grabbed Ms. Allen's breasts, conduct that was against her will and highly offensive to her, which was caught on the Defendant's in-store video system.

167.     Plaintiff Allen called the Kendall Police Department to file an incident report, and after the police viewed the videotape, they sent the case to the Miami State Attorney's Office to decide whether filing charges was appropriate.

168.     On or about September 10, 2013, the Miami State Attorney's Office arraigned Mr. Quiroz on a charge of battery, a 1st degree misdemeanor.

169.     Mr. Quiroz pled guilty to the battery against Plaintiff Allen on or about December 9, 2013 in Miami County Criminal Court.

170.     The battery occurred on the Defendant's premises and the Defendant had ample time to implement programs against sexual violence or criminal activity in the workplace between coworkers, and the Defendant had ample time to discipline Mr. Quiroz. Instead the decided to punish the victim, Ms. Allen, thus doubly victimizing her.

171.     This battery has caused psychological and physiological damages to Ms. Allen, has caused humiliation and embarrassment, has led to a severe loss in reputation, and these damages are compounded by the Defendant still victimizing her by punishing her with an unwilling transfer to a lesser

restaurant location, while rewarding the batterer with no effect upon his job or any other consequence to his employment status.

172. The Plaintiff is entitled to compensatory damages, liquidated damages where they exist, and requests leave to seek punitive damages for the Defendant's conduct during the criminal investigation of the cats which took place inside their restaurant and their conduct after Mr. Quiroz pled guilty to and admitted the unlawful battery against Ms. Allen.

WHEREFORE, the Plaintiffs, Kimberly Shagena, Michelle Espido, Dominique Tavarez, and Diana Allen request that judgment be entered against the Defendant, Flangian's Enterprises, Inc. for damages, including 1) lost wages and prejudgment interest, 2) liquidated damages which are double the monetary damages for willful violations, 3) punitive damages for reckless disregard for the Plaintiffs federally and state protected rights, and punitive damages where the Defendant had a pattern and practice of activities that warrant an award of said damages, 4) reasonable attorneys' fees and costs, and 5) any other lawful and equitable relief this Court deems to be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The Plaintiffs demand trial by jury on all issues triable as of right by a jury.

Dated: December 24, 2013

Respectfully submitted,

REINER LAW, P.A.
224 Datura Street
Suite 1313
West Palm Beach, Florida 33401
Telephone:  (561) 307-8402
Email:mreiner@marcreinerlaw.com
Counsel for Plaintiff

_s/ Marc S. Reiner_
MARC S. REINER, ESQUIRE
Florida Bar Number 0054072